Filed 6/30/21  In re William M. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re WILLIAM M. II, et al., Persons Coming Under the Juvenile Court Law. | B307619, B308854<br><br>(Los Angeles County Super. Ct. Nos. 19CCJP03005A 19CCJP03020A |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM M.,<br><br>Defendant and Appellant. | |

APPEALS from orders of the Superior Court of Los Angeles County, Sabina Helton, Judge.  Appeals as to William M. II are affirmed.  Appeal as to Levi M. is dismissed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Tracey Dodds, Principal Deputy County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————

William M., the father of 15-year-old William M. II and nine-year-old Levi M., appeals the juvenile court's disposition orders removing his sons from his custody after the court sustained amended petitions alleging William had used inappropriate physical discipline that placed both children at substantial risk of serious physical harm. Without disputing the court's jurisdiction findings, William contends its disposition orders are not supported by substantial evidence and there were less restrictive means other than removal to keep his children safe.

William also appeals the juvenile court's order, made while his appeals were pending, terminating dependency jurisdiction over William II with a juvenile custody order awarding William II's mother, T.Q., sole physical and legal custody and limiting William to monitored visitation. William contends the court erred in granting T.Q. sole legal custody of William II.

We affirm the juvenile court's orders as to William II. While these matters were pending on appeal, the juvenile court terminated its jurisdiction over Levi. Because William has not appealed that termination order, we dismiss the appeal challenging Levi's removal as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

William and T.Q. are divorced. At the time these dependency proceedings were initiated, they shared custody of William II pursuant to a family court order. William lived with

2

his girlfriend, Sylvia C., and their child, Levi, and with William II when William II was in William's custody. T.Q. lived separately.

1. *The Dependency Petitions*

On May 13, 2019 the Los Angeles County Department of Children and Family Services (Department) filed a petition pursuant to Welfare and Institutions Code section 300[1] alleging William had physically abused William II by striking him with his hands and with belts and inflicting marks, grabbing him by the ears, throwing him against a wall and furniture, and choking him. The petition also alleged William had physically abused William II's then-seven-year-old sibling, Levi, by striking him with belts and inflicting marks; this behavior placed William II at substantial risk of serious physical harm (§ 300, subd. (a), (b), (j)); and T.Q. knew of the abuse and failed to protect William II (§ 300, subd. (b)). (Super. Ct. L.A. County, No. 19CCJP03005A.)

The same day the Department filed a nearly identical petition as to Levi alleging William's conduct toward Levi and William II placed Levi at substantial risk of serious physical harm (§ 300, subd. (a), (b), (j)), and Sylvia knew of the abuse and failed to protect Levi (§ 300, subd. (b)). (Super. Ct. L.A. County, No. 19CCJP03020A.)

Both children were detained from William. William II was released to T.Q., and Levi to Sylvia.

2. *The Contested Jurisdiction Hearing for Both Children*

At a joint contested jurisdiction hearing on the two petitions, William II testified his father had, from the time William II was in kindergarten, routinely hit him for misbehaving. Sometimes William would strike him with a belt,

---

[1]     Statutory references are to this code.

3

sometimes with his hands. More recently the beatings had become more violent and left marks on William II's body. William instructed him in these instances to tell his teachers and T.Q. the marks were from sports, which William II did.

When William II was in the fourth grade, William slammed his head against bunk beds, causing bruising to William II's eye. In 2018 William threw William II against a couch and choked him after learning he had failed to turn in his assignments at school. William II suffered a black eye during that incident. A few months prior to the initiation of dependency proceedings, William became angry at William II for delaying the family's plans to go on an outing. He cursed at William II and choked, punched and kicked him.

William also used a belt to punish Levi when he misbehaved. William disciplined William II or Levi in their shared bedroom with the door closed. No one else witnessed the beatings. Sylvia saw the bruises afterward and would help William II relieve the pain and swelling. (Sylvia confirmed William disciplined William II and Levi behind closed doors. However, she testified she helped William II attend to injuries she believed he had suffered in sports, not from discipline.)

William testified concerning the incident that led to the filing of the dependency petitions: On April 26, 2019 William II was suspended from school after he was caught vaping marijuana. William picked him up from school. When they returned home, William told him to get inside and close the door because William II "did not know what was coming to him." William II knew that meant William would beat him. William II used his cell phone to call his mother and fled the house despite his father's warning "not to run." William chased him, yelling at

4

him that things were only going to get worse for him. A female passerby William II did not know saw William II fleeing and asked if he needed help. William II got into the woman's car and asked her to drive him to the local park, where he met T.Q. William II told T.Q. and law enforcement officers who had been called to the scene that he feared William would hurt him and he did not want to be near him again. William II said his father had frequently beat him and he was tired of covering it up.

T.Q. obtained a restraining order against William to keep him away from her and William II. T.Q. also told social workers she had been the victim of domestic violence when she was married to William. She knew he was a strict parent, but had not known he had bruised and battered William II. William II never told her.

The Department had received several referrals relating to William's discipline of William II over the years. After investigation, most were determined to be "unfounded." A referral in 2015, after William II told his teacher his father hit him daily with a belt, was determined "inconclusive." During the Department's 2015 investigation, William refused the Department's offer of services, telling the investigator he knew how to discipline his children and did not need any help.

William testified at the hearing that he was a strict parent who made sure his children were well-mannered and suffered consequences for misbehavior. He acknowledged using physical discipline on both his children, including slapping them with open hands or using a belt or a sandal to spank them. He insisted such discipline was appropriate and legal unless it left marks, which, he insisted, it did not. William acknowledged William II frequently had bruises on his body, but claimed they

were the result of William II's participation in contact sports, including wrestling. William denied William II's accusations that he had choked, punched and slammed his head into furniture.

William testified William II had been "hyped up" on concentrated marijuana on the day he fled the house. He believed William II was scared because he knew William despised drug use of any kind. William had also concluded that money missing from the house had been taken by William II to purchase drugs. According to William, William II was lying about abuse to get attention from his mother and to avoid consequences from his father for his behavior. William said he had no intention of changing his parenting style unless the court ordered him to do so. He believed he used appropriate discipline.

Following the hearing the court sustained petitions amended by interlineation to allege that William had inappropriately physically disciplined both children and that the discipline was excessive and caused the children unreasonable pain and suffering (§ 300, subds. (a),(b), (j)). ~(CT 361, RT 449.)~ The court found Sylvia had failed to protect Levi and found T.Q. nonoffending.

3. *The Disposition Hearing*

Proceeding immediately to disposition, the court declared both children dependents of the court, finding by clear and convincing evidence they were in substantial danger in William's custody and there were no less restrictive means to protect them other than removal. The court released William II to T.Q.'s custody under the supervision of the Department and ordered family enhancement services for William, including participation in parenting classes, individual and conjoint counseling, and

monitored visitation. ~(RT 460-461, CT 375-378.)~ The court set a section 364 hearing for November 3, 2020.

The court released Levi to Sylvia's custody with family maintenance services for Sylvia and family enhancement services for William, who had earlier moved out of the home so that Levi could remain in Sylvia's custody. The court ordered monitored visitation for William and set a review hearing.

William appealed both disposition orders.

4. *The Court's Order Terminating Dependency Jurisdiction Over William II*

In its report prepared for the November 3, 2020 review hearing for William II, the Department informed the court William was noncompliant with the case plan—he had not enrolled in counseling. According to the report, William told the Department he was working 80 hours a week at two jobs and had not been able to find a counselor he could afford who could also accommodate his schedule. ~(308854 CT 3 et seq.)~ The Department provided William with additional referrals. In a last minute report the Department advised the court William had registered for a parenting class on October 12, 2020, but had not yet completed it. He registered for individual counseling on October 26, 2020, a few days prior to the hearing, but had not yet been assigned a counselor. The Department questioned William's commitment to participating in services and recommended the court terminate its jurisdiction with a custody order granting T.Q. sole physical and legal custody and William monitored visitation. ~(308854 CT 65.)~

At the section 364 hearing William submitted evidence he had completed his parenting program one day earlier, on November 2, 2020. He had also enrolled in counseling services.

7

He requested an order terminating jurisdiction with a custody order that awarded T.Q. sole physical custody with unmonitored visitation for William and joint legal custody.

Following the hearing the court adopted the recommendations of the Department and William II's counsel and terminated its jurisdiction with a custody order granting T.Q. sole physical and legal custody of William II with sibling visitation and monitored visitation for William. William filed a timely notice of appeal.

## DISCUSSION

1. *Governing Law and Standard of Review*

Before the court may order a child removed from the physical custody of a parent with whom the child was residing at the time the dependency proceedings were initiated, it must find by clear and convincing evidence that the child would be at substantial risk of physical or emotional harm if returned home and there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c); *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 347; *In re T.V.* (2013) 217 Cal.App.4th 126, 135.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.*, at pp. 135-136.)

In reviewing the propriety of a disposition order removing a child from a parent pursuant to section 361, in view of the requirement that the juvenile court make the requisite findings based on clear and convincing evidence, we "must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of

8

proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 (*O.B.*); see *In re V.L.* (2020) 54 Cal.App.5th 147, 155 [*O.B.* is controlling in dependency cases].)  We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and review the record in the light most favorable to the court's determinations; issues of fact and credibility are the province of the juvenile court.  (*In re I.C.* (2018) 4 Cal.5th 869, 892; *In re I.J.* (2013) 56 Cal.4th 766, 773.)

> 2. *Substantial Evidence Supports the Court's Disposition Order Removing William II from William's Custody*

Relying on *In re A.E.* (2014) 228 Cal.App.4th 820, 826, William contends the court erred in removing William II from his custody.  In *In re A.E.* the juvenile court sustained a section 300 petition alleging the father had disciplined his two-year-old child by striking her backside with a belt, inflicting welts and bruising. The father stated he had come to realize his method of discipline was excessive and caused his child unreasonable suffering and, if he had known it at the time he inflicted it, he would have behaved differently.  The father explained it was a one-time incident and insisted he had learned from his mistake. Emphasizing the child's young age, the juvenile court removed her from her father's custody and ordered parenting classes and individual counseling for the father with monitored visitation.

Our Division Eight colleagues reversed, concluding there was not substantial evidence to support removal.  (*In re A.E., supra,* 228 Cal.App.4th at p. 826.)  The court stated, "[I]t is clear that this was an isolated incident that is unlikely to recur. Evidence of past abuse, standing alone, does not meet the clear and convincing standard of proof required to justify her removal from Father's physical custody. . . .  [¶] . . . [¶]  The record in this

9

case shows the risk to [the child] of future abuse is low. Father expressed remorse and is committed to learning better discipline methods. He testified that he understood a young child like A. may misbehave because she is frustrated that she cannot communicate her needs. He also understood that there were other methods of discipline such as giving her a time out, telling her she would not get any candy, or taking away something she liked. That is not substantial evidence of a 'profound lack of understanding of child development.' It is quite the opposite." (*Id.* at p. 826.)

Citing his testimony at trial that he would change his methods of discipline if ordered to do so, William contends he is in the same position as the father in *In re A.E.* He did not realize his methods of discipline were excessive and now that the court has said they were, he would change. In marked contrast to the father in *In re A.E.*, however, William did not acknowledge the impropriety of his conduct at trial; he steadfastly insisted it was proper. He also claimed that William II was lying about the more severe forms of discipline, including punching, kicking and choking, behaviors the court found had occurred. Moreover, the discipline at issue *In re A.E.* was a "one-time" occurrence, not, as here, a pattern of behavior that had continued, and escalated, for more than a decade.

William's reliance on *In re Hailey T.* (2012) 212 Cal.App.4th 139 is similarly misplaced. There, the court of appeal reversed a disposition order removing a three-year-old child (Hailey) from her parents' custody after the juvenile court sustained allegations under section 300, subdivisions (a) and (j), that the parents had inflicted an injury on Hailey's four-month-old sibling. The court of appeal explained there was no evidence the parents had ever

inflicted any harm on Hailey, who, by all accounts, appeared to be thriving in their custody. Moreover, both parents had demonstrated a commitment to services "at the earliest opportunity" and showed meaningful progress in those services by the time of the disposition hearing. (*Id.* at pp. 148-149.) The court also found there were less restrictive alternatives that the juvenile court had utterly failed to consider that could have protected Hailey, such as unannounced visits by the Department to the family home and the father's willingness to move out of the family home. (*Ibid.*)

Unlike the parents in *In re Hailey T.*, William resisted counseling when it was offered and continued to deny the harmful effects of his behavior on William II. Unannounced visits by the Department in these circumstances would do little to protect William II. (See generally *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 [same].) The court recognized William's testimony that he would follow a court order to refrain from imposing excessive discipline; but it remained concerned about William's ability to accomplish such a dramatic shift without professional assistance, particularly since William had always believed, up to and including at trial, that his actions were appropriate. Until William had the benefit of counseling to promote insight and behavior modification, the court explained, William II would not be safe in his custody. Substantial evidence supports the court's removal order. (See *In re E.E.* (2020) 49 Cal.App.5th 195, 217 ["'[t]he trial court is in the best position to determine the degree to which a child is at risk based on the assessment of all the relevant factors in the each case'"].)

### 3. *The Court Did Not Err in Granting T.Q. Sole Legal Custody of William II*

Section 362.4 authorizes the juvenile court, when terminating jurisdiction over a dependent child, to issue a custody and visitation order that "will become part of the parents' family law file and remain in effect in the family law action 'until modified or terminated by a subsequent order.'" (*In re Anna T.* (2020) 55 Cal.App.5th 870, 871, fns. omitted; see § 362.4, subd. (a) ["[i]f the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of 18 years, and proceedings for dissolution of marriage, for nullity of marriage, or for legal separation, of the minor's parents . . . are pending in the superior court of any county, or an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child"].)

When making a custody determination under section 362.4, "it is the best interests of the child, in the context of the peculiar facts of the case before the court, which are paramount." (*In re John W.* (1996) 41 Cal.App.4th 961, 965; accord, *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.) This determination is made without reference to any preferences or presumptions ordinarily applicable in family court. (See *In re John W.,* at p. 972 ["presumption of parental fitness 'that underlies custody law in the family court just does not apply to dependency cases'"]; see also *In re C.M.* (2019) 38 Cal.App.5th 101, 108 ["[a]lthough both juvenile and family courts have authority to make orders regarding custody and visitation, the two courts operate under separate statutory schemes and serve distinct purposes"].)

We review a juvenile court custody order for abuse of discretion.  We "may not disturb the order unless the court ""exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination.""" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300-301; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 902.)

William does not challenge the court's order terminating jurisdiction under section 364 with a custody order granting T.Q. sole physical custody of William II.  However, he contends the court abused its discretion in awarding sole, rather than joint, legal custody to T.Q. because there was no evidence he could not cooperate with T.Q. on making decisions for William II.  Although William emphasizes his and T.Q.'s past cooperation in their shared custody arrangement to support this argument, circumstances had dramatically changed since the initiation of dependency proceedings:  William II had expressed overwhelming fear of his father; T.Q. had obtained a restraining order against him to protect her and William II; and William had described T.Q. as on a "power trip now."  The court found shared legal custody was not in William II's best interests.  William has not demonstrated that decision was arbitrary or irrational.

4. *William's Appeal from the Disposition Order Removing Levi from His Custody Is Moot*

On February 2, 2021, while William's appeals were pending, the juvenile court terminated its jurisdiction over Levi, releasing him to the home "of his parent(s)."  William has not appealed that termination order and has not demonstrated in response to our letter inviting briefing on the question why this court should not dismiss his appeal from the court's disposition order as moot.  (See *In re Rashad D.* (2021) 63 Cal.App.5th 156,

13

164-165 ["because the juvenile court terminated its jurisdiction over [the child] and that termination is final, a remand for further proceedings in the juvenile court would be meaningless"; accordingly, the appeal is properly dismissed as moot because the court cannot provide any effective relief]; see generally *In re N.S.* (2016) 245 Cal.App.4th 53, 60 ["the critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error"].)

## DISPOSITION

The disposition order removing William II from William's custody and the order terminating dependency jurisdiction over William II and awarding sole legal and physical custody of William II to T.Q. are affirmed. The order removing Levi from William's custody is dismissed as moot.


PERLUSS, P. J.

We concur:


SEGAL, J


FEUER, J.